UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-23041-CIV-GOODMAN
[CONSENT CASE]

TIM HORTONS USA, INC. et al,

      Plaintiffs,

v.

GURVINDER SINGH, et al.,

      Defendants/Counter-Plaintiffs.

_____/

**ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT
ON COUNT V OF THE COUNTERCLAIM
(FOR DECLARATORY JUDGMENT RELIEF)**

Doughnuts usually make people happy. National Doughnut Day is celebrated in the United States on the first Friday of June of each year. Parry Gripp, a singer-songwriter and the lead vocalist and guitarist for the pop punk bank Nerf Herder, wrote a song called "One Donut a Day," which has nothing but good things to say about the edible, deep-fried delight: "One donut a day, and everything's gonna be okay. Hey! Eat a donut a day, And everything's gonna be o-o-o-o-o-okay."[1]

Smithsonian Magazine published an article in March 1998 entitled "The History of the Doughnut," which explained that doughnuts were promoted on posters at the

---

[1]     PARRY GRIPP, *One Donut a Day*, *on* DO YOU LIKE WAFFLES? (Oglio Records 2008).

1934's World's Fair in Chicago as "the food hit of the Century of Progress." The article noted that, as of 1998, approximately 10 billion doughnuts were made each year in the United States.[2] Famed songwriter Irving Berlin penned a song called "We Made the Doughnuts Over There," in which he explained that "We're the girls who made the doughnuts for the doughboys over there."[3]

And in an article entitled "Doughnut or Donut? The Great Spelling Debate of Our Time," writer Kristen Aiken began her piece by proclaiming that "doughnuts have become an integral part of American culture, loved for providing us with mouths full of comfort and loathed for ruining our diets."[4] Doughnuts have even found their way into music videos, including one featuring iconic landmark "Randy's Donuts" in a Justin Timberlake video for his song "Can't Stop the Feeling." That donut store is famous for its giant 32-foot doughnut towering above its rooftop.[5]

---

[2]     David A. Taylor, *The History of the Doughnut*, Smithsonian Magazine (Mar. 1998) http://www.smithsonianmag.com/history/the-history-of-the-doughnut (last visited Mar. 30, 2017).

[3]     Irving Berlin, *We Made the Doughnuts Over There* (1919).

[4]     Kristen Alken, *Doughnut or Donut? The Great Spelling Debate of Our Time*, The Huffington Post (June 15, 2016) http://www.huffingtonpost.com/entry/doughnut-vs-donut_us_574ef9fbe4b02912b241574c  (last visited Mar. 30, 2017).

[5]     Jeanette Settembre, Justin Timberlake's "Can't Stop The Feeling" video features iconic sweet shop Randy's Donuts, NY Daily News (May 18, 2016), http://www.nydailynews.com/life-style/eats/justin-timberlake-features-iconic-randy-donuts-music-video-article-1.2641449 (last visited Mar. 30, 2017).

Miami-Dade County is no exception to the doughnut-loving locales and recently, on March 30, 2017, hosted a doughnut festival (called "Donuts!") in the Wynwood area of Miami. According to a January 11, 2017 article discussing the then-upcoming doughnut festival, the 2016 event sold out quickly, attracting 650 attendees who were provided with 14,000 doughnuts.[6]

This lawsuit is about doughnuts. Specifically, it is about a doughnut franchise agreement. But, despite the usually-positive, festive atmosphere surrounding doughnuts, the doughnut operation in this case has not generated much happiness among the parties to this lawsuit. To the contrary, the doughnut business at issue here has generated disputes and bad feelings, not to mention litigation.

This lawsuit arises from the purported termination of a franchise agreement, which led to a lawsuit by the franchisor (Tim Hortons USA Inc., a/k/a "THUSA") and the landlord (Tim Donut U.S. Limited, Inc. ("TDUSL")) against the franchisee, Panagg Café Incorporated ("Panagg"), and its three guarantors (Gurvinder Singh, Ashna Walia and Adarsh Walia). Panagg and its three guarantors filed a Counterclaim, and Count V of that Counterclaim seeks a declaratory judgment.

According to the Counterclaim, THUSA's Notice of Termination was premature because it was sent one day before expiration of Panagg's opportunity to cure. Plaintiffs

---

[6]     Clarissa Buch, *Donuts! Returns to Wynwood in March, Tickets on Sale Now*, Miami New Times (Jan. 11, 2017) http://www.miaminewtimes.com/restaurants/donuts-returns-to-wynwood-in-march-tickets-on-sale-now-9053815 (last visited Mar. 31, 2017).

disagree, and contend that the Notice of Termination was timely and not premature. Under Plaintiffs' version of events, the five-day cure period expired on July 12, 2017 because the Financial Default Notice was sent on July 7, 2016 via email and overnight delivery. Panagg contends that the cure period expired on July 13, 2017, which it says means that its July 13, 2016 offer to cure was timely.

Plaintiffs' motion for partial final summary judgment [ECF No. 60] targets the declaratory relief sought in Count V of the Counterclaim. It contends that (1) Panagg received the Financial Default Notice and had actual knowledge of it on July 7, 2016;  (2) the cure period expired on July 12, 2016; (3) Panagg did not offer to cure the financial default until July 13, 2016; and (4) its July 13, 2016 Confirmation of Termination was timely.

Defendants/Counter-Plaintiffs argue that the partial summary judgment motion should be denied for several reasons: (1) the Court should not resolve the motion because it is intertwined and indivisible with other claims in both the Amended Complaint and Counterclaim; (2) THUSA failed to timely provide individual notice to each of Panagg's representatives and its guarantors; (3) the Financial Default Notice was improperly sent because it was issued by email even though the Franchise Agreement provided for notice by personal delivery or telefax; and (4) THUSA ignores a course of conduct which constituted an oral payment plan.

Plaintiffs challenge these opposition arguments. They say that (1) partial summary judgment is permissible even it seeks to resolve less than the entire case; (2) the emailed Financial Default Notice was sufficient because strict compliance with the type of notice provided is unnecessary when, as here, the recipient has actual notice; (3) the guarantors were not entitled to individual notice as guarantors because they agreed to waive notice in the guarantee itself; and (4) although a course of dealing may explain an ambiguous contract, it may not contravene a contrary express provision in a contract.

For the reasons outlined in greater detail below, the Undersigned grants, but **only in part,** Plaintiffs' motion for partial summary judgment on Count V. The specifics of the ruling, and its limitations, are provided later in the Order.

**Factual Background**

The Motion and the Inadequate Response

Plaintiffs filed their summary judgment motion with a Statement of Material Facts [ECF No. 61]. Panagg and the three guarantors (i.e., the Counter-Plaintiffs) filed a response and a Response to Plaintiffs' statement of material facts [ECF Nos. 68; 69]. But the response to the statement of material facts is procedurally improper and violates the applicable local rule.

Plaintiffs' Statement of Material Facts includes 20 separate facts, in paragraphs numbered 1 through 20. The Defendant's/Counter-Plaintiffs' response disputes some of

the 20 alleged facts, but does so in a confusing and procedurally improper way. For example, numbered paragraph **3** of its response discusses the purportedly undisputed facts in paragraph <u>11</u> of Plaintiffs' statement of facts, paragraph 9 of their response denies the statements from paragraph 17, and paragraph 11 denies the statements from paragraph 19.

In addition, the Defendants'/Counter-Plaintiff's response [ECF No. 69, p. 3] included their own additional facts in the same paragraph and then included a final, all-encompassing paragraph (number 12) "incorporating" Singh's declaration "in its entirety as a statement of material facts[.]" For example, paragraph 5 of the response admits certain portions of paragraph 13 and then provides *additional* purported facts.

Under Local Rule 56.1, the Undersigned has authority to deem as admitted all the facts submitted by Plaintiffs in support of their partial summary judgment arguments.

As the plain language of Local Rule 56.1 states, "(a): A motion for summary judgment **and the opposition thereto** shall be accompanied by a **statement** of material facts as to which it is contended . . . there does exist a genuine issue to be tried[.]" S.D. Fla. L.R. 56.1(a) (emphasis supplied). The local rule requires that such statement "(1) Not exceed ten (10) pages in length; (2) Be **supported by specific references** to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file

with the Court; and (3) **Consist of separately numbered paragraphs**." *Id.* (emphasis supplied).

The local rule further provides that "[s]tatements of material facts submitted in opposition to a motion for summary judgment shall correspond with the order and **with the paragraph numbering scheme** used by the movant[.]" It also provides that "additional facts which the party opposing summary judgment contends are material shall be numbered and **placed at the end** of the opposing party's statement of material facts[.]" (emphasis added).

Failure of a respondent to file a statement of disputed facts, in the format as required above, causes "[a]ll material facts set forth in the movant's statement" to be "deemed admitted unless controverted by the opposing party's **statement**[.]" S.D. Fla. L.R. 56.1(b) (emphasis added).

When a party properly complies with Local Rule 56.1, it is relatively easy for a court to determine whether there is a genuine disputed issue of fact. Basically, all a court needs to do is to look at the opposing statement of material facts on a paragraph-by-paragraph basis, see whether any paragraphs carrying the same number are designated as disputed and then make note of the evidentiary reasons for the dispute. If a Court wanted to see if paragraph 3 of the summary judgment movant's statement of facts is disputed, then it would simply and easily turn to numbered paragraph 3 of the opposition's factual statement.

7

When a party does not comply with the Local Rule by using the same paragraph numbers, however, then it is more difficult for a court to discern if there is an actual factual dispute concerning a specific paragraph. A court needs to review the *entire* opposing statement to determine whether there is a sound factual basis for saying that a point deemed factually undisputed by the movant is actually disputed. Here, for example, I needed to review paragraph 11 of the response to the statement of facts to see if paragraph 19 is being disputed. I should have been able to turn to numbered paragraph 19 to make that determination, but there is no numbered paragraph 19 in Defendants'/Counter-Plaintiffs' response.

This can be an arduous process, and, in any event, generates unnecessary work for the court and its staff.

Defendants'/Counter-Plaintiffs' approach is contrary to the local rule and, in effect, requires me to do their job. Basically, I needed to review all numbered paragraphs of their response to see which of Plaintiffs' numbered paragraphs were being challenged as disputed.

But "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("judges are not required to ferret out delectable facts buried in a massive record, like the one in this case"). The local rule is unambiguous: it requires the response to carry the same paragraph numbering system.

So Defendants/Counter-Plaintiffs did not follow a basic procedural requirement of Local Rule 56.1. This is disappointing, to say the least, and the Court undoubtedly has the discretion to deem all of Plaintiffs' undisputed facts admitted and then enter partial summary judgment in Plaintiffs' favor on Count V as Defendants'/Counter-Plaintiffs' defective response essentially leaves the Court with "the functional analog of an unopposed motion for summary judgment." *Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1343 (S.D. Fla. 2015) (admitting facts from defendant's undisputed material facts statement after reviewing the record based on plaintiff's violation of Local Rule 56.1); *Regions Bank v. 62′ Ocean Sport Fish,* No. 13–20966–CIV, 2014 WL 4055707, at *2 (S.D. Fla. Aug. 14, 2014) (admitting undisputed facts in plaintiff's statement supported by the record based on defendants' violation of Local Rule 56.1).

Because Defendants/Counter-Plaintiffs have not filed an acceptable statement of disputed material facts, the Court, as noted, *could* treat all of Plaintiffs' statement of undisputed facts as true. *See Johnson v. Sch. Bd. of Broward Cty.,* Case No. 07-60797-CIV, 2008 WL 5427789, at *2-3 (S.D. Fla. Dec. 30, 2008) (finding local rule requires that a statement of disputed facts include reference to supporting evidence and deeming facts disputed by plaintiff but not supported by record evidence as admitted).

However, it is clear that Defendants/Counter-Plaintiffs dispute some facts but basically admit the ones relevant for this motion. For example, they do not dispute that Gurvinder Singh ("Singh") received the two notices of default by email, forwarded

them to his daughter within the hour and then telephoned THUSA's Director of Franchise Performance later that same evening.

Therefore, for all practical purposes, Defendants'/Counter-Plaintiffs' procedural misstep is of no legal consequence because they admitted the critical allegations anyway.

But Defendants/Counter-Plaintiffs are not the only parties who committed procedural errors. Plaintiffs did so as well.

Similar to Defendants/Counter-Plaintiffs, Plaintiffs failed to provide a procedurally proper challenge to the undisputed facts urged by Defendants/Counter-Plaintiffs in their factual response [ECF No. 69]. To be sure, Defendants/Counter-Plaintiffs did not themselves comply with the local rule when they submitted their additional facts. Defendants/Counter-Plaintiffs did not include their additional facts at the end of their response to Plaintiffs' statement of facts. Rather, they merely advised that Singh's declaration would be "further incorporate[d]" into their response "as a statement of material facts in opposition to [Plaintiffs'] Motion for Partial Summary Judgment on Count V of the Counterclaim." [ECF No. 69, p. 3].

Singh's declaration [ECF No. 70-1] was filed as an attachment to a separate submission which Defendants/Counter-Plaintiffs filed on the same day as their opposition response and response to Plaintiffs' undisputed facts. His declaration did in

fact list facts in separately numbered paragraphs -- but Plaintiffs did not, as required, submit a procedurally appropriate response.

Specifically, Local Rule 56.1(a)(3) requires that the movant (i.e., Plaintiffs) "shall use that numbering scheme" [used in the additional facts] "if those additional facts are addressed in the reply." Plaintiffs did not do that in their reply, however.

Nevertheless, the procedural missteps made by both sides will not interfere with an order granting **in part** the motion for partial summary judgment filed by Plaintiffs concerning Count V of the Counterclaim. That is because the order will be limited, as explained later in this Order.

<u>The Undisputed Facts</u>

As noted, Defendants/Counter-Plaintiffs admitted most of the undisputed facts designated by Plaintiffs. To the extent that Plaintiffs challenged an undisputed fact, this factual summary will flag the specific factual issue (or the specific portion being challenged) as disputed.

1.      Panagg Café Incorporated ("Company") owned and operated a franchised TIM HORTONS® store, Store #7472 (the "Store") located at 1517 E. Ridge Road, Irondequoit, NY in accordance with the terms and conditions of THUSA's Franchise Agreement, as amended (the "Franchise Agreement").

2.      Company also leased the premises upon which the Store is located from TDUSL pursuant to a December 28, 2011 lease agreement ("Lease").

3.     Pursuant to a written guarantee (the "Franchise Agreement Guarantee"), the Guarantors -- jointly, severally, absolutely and unconditionally guaranteed the payment and performance of each and every obligation of Company to THUSA under the Franchise Agreement.

4.     Pursuant to a written guarantee (the "Lease Guarantee"), the Guarantors jointly, severally, absolutely and unconditionally guaranteed the payment and performance of each and every obligation of Company to TDUSL under the Lease. (The Franchise Agreement Guarantee and the Lease Guarantee are hereinafter collectively referred to as the "Guarantees").

5.     Under the terms of the Franchise Agreement, Company is obligated to make payments to THUSA for royalties, advertising and other fees. Specifically, the Franchise Agreement requires Company to pay THUSA a royalty of a certain percentage of weekly gross sales in return for the use of the TIM HORTONS System and the THUSA Marks. Additionally, the Franchise Agreement obligates Company to pay THUSA an amount equal to a certain percentage of Company's monthly gross sales for the preceding calendar month in return for advertising, sales promotion and related expenditures made by THUSA.

6.     Under the terms of the Lease, Company is obligated to make monthly payments to TDUSL as rent for the Store premises. Company is also obligated to pay all

taxes, assessments, and charges imposed in connection with the ownership, occupancy, or possession of the Store.

7.     The Franchise Agreement and Lease contain provisions regarding default and establishing the parties' rights and obligations in the event of a default thereunder.

8.     The relevant terms of the Franchise Agreement provide that Company's failure to comply with a provision of the Franchise Agreement is a default thereunder. The Franchise Agreement further provides that if an act of default occurs and Company fails to cure the default after any required notice and within the cure period applicable, if any, THUSA may, at its option and without prejudice to any other rights or remedies, terminate the Franchise Agreement.

9.      The relevant terms of the Lease provide that if the Franchise Agreement is terminated, the Lease shall be terminated forthwith.

10.    Defendants/Counter-Plaintiffs deny (i.e., dispute) Plaintiffs' contention that they have breached the Franchise Agreement, Lease and Guarantees ("Agreements") by failing to make payments for royalty, advertising, rent and other amounts due.

11.    On July 7, 2016, Plaintiffs sent Defendants/Counter-Plaintiffs two notices of default via email and overnight delivery: a Notice of Default-Financial ("Financial Default Notice") and a Notice of Default-Operations ("Operations Default Notice") (the Financial Default Notice and the Operations Default Notice are hereinafter

collectively referred to as the "Default Notices"). Defendants/Counter-Plaintiffs contend that the email was inadequate because it was not sent separately to the wife (Adarsh Walia) and daughter (Ashna Walia) of Singh.

12.     The Default Notices were emailed at approximately 5:32 p.m. on July 7, 2016. The subject line of the email provides: "Tim Hortons Restaurant # 7472 - Notices of Default - Operations and Financial."

13.     Less than an hour after the email with the attachments was received, the email with the attachments were forwarded to Singh's other daughter, Nidhi Walia, on July 7, 2016 at 6:24 p.m. Defendants/Counter-Plaintiffs deny (i.e., dispute) that the attachments constituted legally sufficient default notices. In addition, they say that Nidhi Walia is not listed in the Franchise Agreement, Lease or Guarantee as a person to whom notice would be given by THUSA.

14.     Shortly thereafter, Singh telephoned Christopher Kennedy (THUSA's then Director of Franchise Performance) on July 7, 2016 at 6:59 p.m. Defendants/Counter-Plaintiffs dispute that the telephone conversation involved a discussion of the grounds mentioned in the Default Notices. Instead, Singh claims that he telephoned Mr. Kennedy to discuss his requests for reports concerning health inspections and pest inspections. He says he did not call Mr. Kennedy in response to the default notices sent approximately an hour earlier and specifically denies discussing the default notices when he telephoned Mr. Kennedy and had a conversation.

14

15.     Singh and Christopher Kennedy spoke on the telephone for approximately 12 minutes on July 7, 2016. As noted, Singh contends that none of that discussion involved the default notices.

16.     The Financial Default Notice provides that if the amounts past due are not paid in full within five (5) days of receipt of the notice, the Franchise Agreement shall terminate upon written confirmation. Singh does not actually dispute that the Notice says what it says. For all practical purposes, he ignores and evades the issue of the timing, saying that he admits the notices were delivered to him, his wife and his daughter by Federal Express on July 8, 2016. Thus, the Undersigned construes Defendants'/Counter-Plaintiffs' evasive, non-responsive response as a concession that the July 7, 2016 email was received on July 7, 2016 and said what it said.

17.     Although the Financial Default Notice was received by email on July 7, 2016, the financial default was not cured on or before July 12, 2016. [Defendants/Counter-Plaintiffs effectively concede this point because they provide another non-responsive response here. They technically "deny" the allegation, but the denial is based on their view that the attachments were defective and inadequate. That issue remains to be seen, but there is no legitimate dispute that the email was, in fact, received on July 7, 2016. Whether the email should have been separately sent to others is another issue, as is the question of whether the email -- as opposed to another *form* of service -- is adequate notice].

18.     Accordingly, by letter dated July 13, 2016, Defendants/Counter-Plaintiffs were notified that THUSA was taking the positon that the Franchise Agreement and Lease terminated on July 13, 2016 (the Confirmation of Termination"). Defendants/Counter-Plaintiffs dispute that the email constituted proper notice of termination. But, again, there is no doubt that the letter said what it said and that it was received.

19.     Defendants/Counter-Plaintiffs did not offer to cure the alleged financial default until July 13, 2016. There is no bona fide dispute about that. There is, of course, a dispute over the issue of whether the cure had to be communicated by July 12, 2016 or July 13, 2016. And there is also a dispute about the effectiveness of THUSA's email and letter communications. But there is surely no legitimate challenge to the fact that Defendants/Counter-Plaintiffs did not offer to cure the purported financial defaults until July 13, 2016.

20.     Singh is the President of Company, and Ashna Walia is the Vice President of Company.

21.     The Undersigned notes that Defendants/Counter-Plaintiffs have not alleged that they challenged at the time -- i.e., in July 2016 -- that the form of the Notices was inadequate or insufficient.

16

**Applicable Legal Principles and Analysis**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citation and marks omitted). If the movant establishes the absence of a genuine issue, then the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

For issues on which the opposing party will have the burden of proof at trial, the movant can prevail by merely pointing out that there is an absence of evidence to support the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "By its very terms, this standard provides that the mere existence of *som*e alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact

17

is a "genuine" issue only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

An issue of fact is genuine "if the record taken as a whole could lead a rational tier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In applying this standard, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the summary judgment motion. *Id.* at 646 (internal citation omitted).

Nevertheless, the non-movant cannot defeat summary judgment by: (a) "rest[ing] upon mere allegations or denials," *Woolsey v. Town of Hillsboro Beach*, 541 F. App'x 917, 919 (11th Cir. 2013); (b) "simply *saying* the facts are in dispute," *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539, 2014 WL 7272974, at *7 (S.D. Fla. Dec. 18, 2014); or (c) relying on "evidence that is merely colorable or not significantly probative," *Fields v. Gorman*, No. 09-61466, 2010 WL 3769396, at *3 (S.D. Fla. Sept. 3, 2010). "Rhetoric and attorney argument are no substitute for record evidence." *Latele*, 2014 WL 7272974, at *7.

To the contrary, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 252. Indeed, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his

case on which he bears the burden of proof at trial." *Schechter v. Ga. State Univ.*, 341 F.

App'x 560, 562 (11th Cir. 2009) (citing *Celotex*, 477 U.S. at 322).

Conclusory allegations, subjective beliefs, opinions, and unsupported assertions

are insufficient as a matter of law to withstand summary judgment. *See Mayfield v.*

*Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (finding that conclusory

allegations and conjecture cannot be the basis for denying summary judgment).[7]

<u>Should a Ruling Be Postponed?</u>

The Undersigned is not convinced that Plaintiffs' motion for partial summary

judgment on one count of the Counterclaim should be postponed merely because

Defendants/Counter-Plaintiffs say the issues are intertwined with other claims. Federal

Rule of Civil Procedure 56(a), which was amended in 2010, authorizes the entry of

summary judgment to a part of a claim or defense. *Tampa Bay Water v. HDR Eng'g Inc.*,

Case No. 8:08-CV-2446-T-27TBM, 2011 WL 3101803, at *4 n. 6 (M.D. Fla. July 25, 2011)

(stating that motion for partial summary judgment on one claim and damages issues

was proper under amended Rule 56, where movant was seeking judgment as to an

---

[7]     Counts I and II of the Amended Complaint assert federal claims under the Lanham Act. It appears as though the parties are not actively pursuing or defending those claims. In an "Agreed Motion Dropping Counts I through IV of the Amended Complaint, Plaintiffs asked for leave to drop the first four counts of their Amended Complaint. I denied that motion on procedural grounds, but it seems as though those four counts are no longer active. Plaintiffs also asserted diversity jurisdiction under 28 U.S.C. § 1332.

entire count in the complaint under Rule 56(a); court questioned the propriety of pre-2010 case law addressing partial summary judgments in light of the 2010 amendments).

Moreover, the Undersigned does not agree that this claim (i.e., one count for declaratory relief in the Counterclaim) is confusingly intertwined with other claims. To the extent that there might conceivably be an overlap, the narrow scope of this Order assures that there will be no overlap or that any possible overlap would not interfere with the upcoming bench trial on the other claims.

<u>Was the Email Notice Adequate When the Contracts Did Not Specifically Authorize Notice in that Form?</u>

Strict compliance with a notice provision is unnecessary if a party, such as the case here, has actual notice. *See Patry v. Capps,* 633 So. 2d 9, 12-13 (Fla. 1994) (strict compliance with the notice provision in the statute was not necessary -- and service by alternate means was sufficient -- where the party received actual notice).

Florida appellate courts and Florida federal courts follow the *Patry* rule. *See, e.g., Lazzara Oil Co. v. Columbia Cas. Co.,* 683 F. Supp. 777, 782 (M.D. Fla. 1988) (even if response did not strictly comply with notice requirements of statute, where party has actual notice, legislative intent behind notice requirements was effectuated); *Phoenix Ins. Co. v. McCormick,* 542 So. 2d 1030, 1032 (Fla. 2d DCA 1989) (strict compliance with statutory notice provision is not required where party received actual notice; "no prejudice results from a notice delivered by one method over another."); *Angrand v. Fox,* 552 So. 2d 1113, 1114 n.4 (Fla. 3d DCA 1989) (deviation from mode of

service specified in statute is not fatal to claim if defendant received actual notice);

*Blosam Contractors, Inc. v. Joyce,* 451 So. 2d 545, 548 (Fla. 2d DCA 1984) (substantial

compliance with notice requirements of statute sufficient where actual notice received);

*Bowen v. Merlo,* 353 So. 2d 668, 668-69 (Fla. 1st DCA 1978) (where a claim of lien was

sent by regular mail instead of certified mail as required by statute, but owner received

actual notice of the claim of lien, substantial compliance with statute sufficient).

Similarly, the rule that technical compliance is unnecessary applies in the context

of substantial compliance with notice of default provisions in a mortgage. *See, e.g., Diaz*

*v. Wells Fargo Bank, N.A.,*189 So. 3d 279, 282 (Fla. 5th DCA 2016) (while appellants were

correct that the notice requirements in the mortgage are conditions precedent to

the bank filing the foreclosure suit, substantial compliance, not strict compliance, with

this condition precedent is all that is required); *Suntrust Mortg., Inc. v. Garcia,* 186 So. 3d

1036 (Fla. 3d DCA 2016) (notice of default that substantially complied with mortgage

that was sufficient); *Lafaille v. Nationstar Mortg., LLC,* 197 So. 3d 1246, 1247 (Fla. 3d DCA

2016) (substantial compliance with the mortgage agreement's notice provision is

sufficient); *Bank of Am. v. Cadet,* 183 So. 3d 477, 478 (Fla. 3d DCA 2016) (notice of default

under mortgage need only substantially comply with provisions of mortgage in order

to be sufficient); *see also Dauer v. Gen. Health Servs., Inc.,* 317 So. 2d 456, 457 (Fla. 3d DCA

1975) (Florida law requires only substantial performance of conditions precedent in

order to authorize recovery on a contract); *Cohen v. Rothman*, 127 So. 2d 143, 147 (Fla. 3d DCA 1961) (same).

In their opposition response, Defendants/Counter-Plaintiffs suggest that the Florida law permitting less-than-complete technical compliance with a notice provision is inapplicable to contract-based notice provisions (as opposed to, for example, statutory notice requirements). But the Undersigned is not convinced by this argument.

For example, in *Warsteiner Importers Agency, Inc. v. Republic Nationall Distributing Company, LLC*, the Court addressed whether sending notice via Federal Express ("FedEx") was sufficient notice where the notice was required to be sent by certified mail. No. 8:08-CV-1156-T-24TGW, 2008 WL 4104568, at *6 (M.D. Fla. July 31, 2008). The Court held that the FedEx delivery of the notice was the equivalent of sending the notice by certified mail and created the same paper trail. *Id*. Thus, the Court found no merit to the argument that notice by FedEx was inadequate. *Id.*

Likewise, in *Restaurant Associates Industries, Inc. v. Anheuser-Busch, Inc.*, the district court (applying Florida law) addressed whether a notice of non-renewal of a management agreement, which was received in the usual time for mail delivery, was ineffective to terminate the agreement because it was sent by regular mail, not registered or certified mail as specified by the management agreement. 422 F. Supp. 1105, 1107-08 (S.D.N.Y. 1976), aff'd in part, rev'd in part on other grounds, 559 F.2d 1205 (2d Cir. 1977) (unpublished opinion). When it rejected the argument that the notice was

ineffective, the Court found that if the letter was in fact received, then the failure to send it by registered or certified mail does not destroy its effectiveness as notice. *Id.* at 1108 (citing *Barbier v. Barry*, 345 S.W.2d 557 (Tex. Ct. App. 1961)).[8]

Defendants/Counter-Plaintiffs also seem to suggest that Plaintiffs' argument is flawed because it relies on a telephone call between Singh and Mr. Kennedy. Although it is true that Plaintiffs' motion mentions this telephone conversation, it did not do so to establish notice. Instead, the telephone call merely demonstrates that Singh received the e-mail on July 7, 2016 and had actual notice of the two default letters -- a point which is undisputed.

<u>Did the Notice Have to Be Separately Sent to Multiple Persons?</u>

There is no genuine dispute over the fact that Singh received the emails and notices on July 7, 2016. Defendants/Counter-Plaintiffs contend that these notices were defective because they were not separately provided to all three persons listed on the signature page of the Franchise Agreement. The Undersigned is not persuaded by this challenge.

The Franchise Agreement is between THUSA and Panagg. The "Notices" provision, Section 18.01 [ECF No. 60-1, p. 49 (p. 38 of the Agreement)] requires notices to be sent to "the respective **parties** at the **addresses** set forth on the signature page." (emphasis supplied). The Franchise Agreement's signature page [ECF No. 60-1, p. 53 (p.

---

[8]      The Court also deemed it significant that the party challenging the form of notice "made no objection at the time to the form of the posting and the point lacks merit." *Id.*

42 of the Agreement)] lists Singh and Ashna Walia as the president and vice president of Panagg. The *address* for Panagg, however, is in Irondequoit, New York, "Attention: Gurvinder Singh, Ashna Walia and Adarsh Walia." [ECF No. 60-1, p. 53 (p. 42 of the Agreement)].

Panagg is a party to the Franchise Agreement. Singh and Ashna Walia are not *parties* to that agreement. They merely signed as representatives for Panagg, the contracting party. Panagg's address is in New York, and notices were to be sent to the "attention" of three individuals. The Franchise Agreement does not require that notices be sent three separate times to three separate individuals. To the contrary, a notice (i.e., **one** notice) to the *attention* of all three, at the Company address, is the requirement.

The Default Notices, sent by email, were in fact addressed to the Company, at the proper address, to the attention of the three individuals. The Termination Notice was sent by the same method. Other than the form of the notice (i.e., email), the Default Notices and Termination Notice complied with the Franchise Agreement.

Defendants/Counter-Plaintiffs also contend that the three individuals were also entitled to individual and separate notice as Guarantors. But the Guarantee provides that the Guarantors waive notice of demand for payment or performance by Franchisee.

<u>What about the Course of Dealing?</u>

According to Singh's declaration, before July 7, 2016, Panagg was making weekly payments to THUSA through an ACH (the payment system pursuant to the Electronic

Transfer Payment Program) withdrawal from Panagg's bank account. That payment was made in accordance with Tim Hortons' Electronic Transfer Payment Program ("ETTP") program, pursuant to section 4.05 of the Franchise Agreement. Singh provides a series of emails (in reverse date order) reflecting the weekly payment course of dealing with Tim Hortons that commenced in late 2015 and continued all the way through July 7, 2016. Indeed, Defendants/Counter-Plaintiffs emphasize that on the very day that Tim Hortons' Miami in-house counsel claims to have provided an email notice of default to Panagg and the guarantors, Lazara Alcantara, an accounts receivable administrator for Tim Hortons' parent company in Ontario, Canada, sent Singh a weekly email regarding the amounts owed to the franchisor.

As Singh explains, he was told that the total amount due for current and old debt was $61,754.07. When Singh was asked what he could pay that week, he responded that he could pay $6,700. Singh further explains that Tim Hortons took the ACH payment on July 11, 2016 and he produced Panagg's bank statement in support.

According to Defendants/Counter-Plaintiffs, THUSA could not ignore this established course of dealing in declaring that Panagg was in default of its financial obligations.

Defendants/Counter-Plainitffs also contend that THUSA ignores a provision of the Franchise Agreement that expressly relieves Panagg from being in default in light of

the ongoing dispute with the tax assessor.  Section 12.01(s) of the Franchise Agreement provides:

> s.  If, within five (5) days after receipt of written notice from Franchisor that any payment due from the Franchised Business is overdue, Franchisee does not make such payment in the requested amount to Franchisor, an affiliate of Franchisor, or to Franchisee's suppliers or creditors, unless, with respect to Franchisee's suppliers or creditors, Franchisee notifies Franchisor of the existence of a *bona fide* dispute and takes immediate action to resolve it;

Singh explains the facts regarding the dispute with the tax assessor, including THUSA's acknowledgement of the issue, hiring of an expert to appeal the tax assessment, and the fact that this dispute was ongoing until he was notified of its final stage resolution on July 11.  Thus, Defendants/Counter-Plaintiffs contend, this ongoing dispute, under the express terms of the Franchise Agreement, precluded a claim that Panagg was in default of its financial obligation before July 11. According to Defendants/Counter-Plaintiffs, the earliest date when THUSA could have provided notice that, in light of the final stage of the tax dispute, the entire debt would be owed, was July 11.  Therefore, Defendants/Counter-Plaintiffs argue, on this record, that a termination on July 12 violated the Franchise Agreement.

Singh provided a detailed factual description of the events that occurred between July 7 and July 14, 2016. These facts include the difference between the $61,754.07 that Lazara Alcantara told Singh was the outstanding accounts receivable on the morning of

July 7 and the $66,610.83 that THUSA's in-house counsel claimed was the total debt owed in the July 8 default notice.

Given the undisputed facts outlined above, however, Plaintiffs are entitled to a final summary judgment, in part, on Count V of Defendants'/Counter-Plaintiffs' Counterclaim for Declaratory Judgment because the Default Notices and Termination Notice were sent to the appropriate recipients through an acceptable form (i.e., email) and which were received on the dates noted in Plaintiffs' partial summary judgment motion. Thus, to phrase the Order differently, partial summary judgment is granted in part in favor of Plaintiffs on Count V of the Counterclaim in that there is no genuine issue of material fact that Defendant Panagg received the Financial Default Notice by email on July 7, 2016, the purported financial default was not cured on or before July 12, 2016, and the July 13, 2016 notice was timely as a termination notice (assuming other issues are resolved in THUSA's favor).

This Order, however, does not resolve all issues in Count V of the Counterclaim[9] because, among other reasons, it does not address whether THUSA had adequate grounds for sending the Default Notices and Termination Notice, whether a course of

---

[9]     The Counterclaim asserts other Counts: (1) breach of contract arising out of wrongful termination of the franchise agreement and lease; (2) breach of implied duty of good faith and fair dealing; (3) estoppel; and (4) injunctive relief (seeking to enjoin THUSA from (a) attempting to terminate the franchise agreement, (b) taking action to enforce the purported termination of the franchise agreement or lease agreement, and (c) otherwise interfering with Defendants'/Counter-Plaintiffs' performance of the franchise agreement and lease agreement.

conduct precluded THUSA from sending the Default Notices and Termination Notice, whether the franchise has in fact been properly terminated and whether THUSA used the grounds mentioned in the Notices as a pretext to disguise some other reason for the Notices, such as a scheme to transfer the franchise to another, more-favored franchisee. Instead, it addresses only the issues concerning when the Notices and Termination were sent; when they were received; whether the form of the submission (i.e., email) was sufficient when there is no doubt that these materials were, in fact, received; and whether Panagg offered to cure before July 13, 2016.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on April 5, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record

28