TIM HORTONS USA, INC. et al,

      Plaintiffs,

v.

GURVINDER SINGH, et al.,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL

### I.      Introduction

In a hit song released on its 1973 *Billion Dollar Babies* album, the Alice Cooper band, sometimes considered the pioneers of "shock rock," belted out the following musical anthem: "No more Mister Nice Guy / No more Mister Clean / No more Mister Nice Guy / He said you're sick, you're obscene."[1]

The concept of not being a nice guy resonates with Defendants' perspective about the factual and legal issues generated in this lawsuit filed by a donut restaurant franchisor against one of its franchisees, culminating in a bench trial before the Court. In effect, the franchisee, Panagg Café Incorporated, contends that the franchisor, Tim

---

[1]    ALICE COOPER, *No More Mr. Nice Guy, on* BILLION DOLLAR BABIES (Warner Bros. 1973).

Hortons USA Inc., adopted the "No More Mr. Nice Guy" approach when it terminated the franchise agreement approximately four and a half years after the agreement's inception.

But the franchisor says that it had the absolute contractual right to terminate the agreement. Moreover, it implicitly argues that the *franchisee* was the first to adopt the "No More Mr. Nice Guy" approach when its law firm responded to the franchisor's initial demand letter that flagged the alleged breach. Instead of conceding the debt its client owed or starting negotiations, the franchisee's initial law firm adopted an aggressive approach. One of its attorneys sent a response letter in which she (1) incorrectly alleged that the parties had previously agreed to a specific payment schedule, (2) incorrectly alleged that the franchisor was accelerating the debt, (3) advised that the franchisor was estopped from terminating the franchise agreement, (4) took the position that any termination of the franchise agreement would be wrongful, and (5) threatened litigation if the franchisor followed through on its announced intent to terminate if the defaults were not timely cured.

The franchisee's principals and guarantors also owned another donut franchise with Tim Hortons. Nevertheless, when the franchisee did not cure the breach, the franchisor terminated the agreement at issue immediately after the cure period ended. It would not permit Panagg to avoid the termination by paying the debt (or, more specifically, *offering* to pay the debt) a few hours after the termination was implemented.

The franchisee implicitly suggests that Tim Horton's strict approach is consistent with the Alice Cooper "No More Mr. Nice Guy" refrain -- but, as outlined below in the findings and conclusions, the franchise agreement *permitted* Tim Horton's to act as it did.

To be sure, Tim Hortons surely *could* have allowed Panagg to agree to a specific payment plan (and could have decided to not terminate the agreement). But it decided to follow another strategy. Presumably, it had its own reasons for sticking to the literal terms of the franchise agreement and taking full advantage of the remedies the parties agreed to.[2]

In the absence of conflicting statutory authority,[3] a party to a franchise relationship contract does not generally lose its ability to enforce the contract terms

---

[2]    Before trial, Panagg alleged that Tim Horton's reasons for closing the restaurant were "pretextual," designed to "conceal[] Franchisor's [Tim Horton's] intent to expropriate Panagg Café's business and sell it to Ninety Rock," another franchisee. [ECF No. 58, p. 7]. In its counterclaim, Panagg alleged that Tim Horton's secret intent in closing the restaurant was to "drive Franchisee [Panagg] out of business and replace them as operators of the Restaurant with a different, more-favored franchisee" (i.e., Ninety Rock). [ECF No. 27, p. 12 ¶ 8]. But Ninety Rock never took over the restaurant after Tim Hortons terminated the Panagg franchise agreement. By the end of trial, Panagg had, for all practical purposes, abandoned the pretext theory, though it still advanced the theme that the termination was "opportunistic." [ECF No. 130, pp. 58–59].

[3]    For example, many states and federal territories have enacted laws governing franchise relationships and terminations. Many of them govern specific industries, such as motor vehicle dealers, gasoline dealers, farm equipment dealers and alcoholic beverage distributors. *See generally* RUPERT M. BARKOFF ET AL., FUNDAMENTALS OF FRANCHISING 185–89 (4th ed. 2015). The parties have not taken the position that the franchise agreement at issue is subject to any specific statute governing (specifically) the donut or restaurant industry or franchise contracts (in general).

merely because it makes full and immediate use of the remedies agreed to in the contract.

Tim Hortons is entitled to a judgment in its favor on its claim for termination based on a material breach -- i.e., failure to timely pay money owed under the franchise agreement. It is therefore entitled to recover $59,917.06 for amounts owed as of July 2016, plus pre-judgment interest, costs, and attorney's fees. Tim Hortons, however, is **not** entitled to recover on its future lost profits claim because the evidence it relies on is inadmissible. Lastly, Tim Hortons is also entitled to a judgment in its favor on Defendants' counterclaims.

These results may appear harsh but, without a specific statute or regulation prohibiting or restricting certain provisions or rights, contracts do not become unenforceable merely because their agreed-upon remedies create an unpleasant result for the breaching party. This reality exists even if the breaching party is a "Mister Nice Guy" (or if the non-breaching party pursues a "No More Mr. Nice Guy" strategy).

In large part, the results here (i.e., largely, though not completely, a victory for the franchisor) are merely a logical consequence of the nature of franchising. Indeed, one of the leading treatises on franchising urges counsel to give the prospective franchisee client a "*Miranda* warning"[4] about franchising and then explain to the client that "the contract probably is one-sided, enforceable and . . . entail risks that are

---

[4]    *Miranda v. Arizona,* 384 U.S. 436 (1966).

different from and usually above and beyond the ordinary business risks associated with business ownership[.]"[5]

The specific facts and precise legal rules supporting this result are outlined here, in the findings of fact and conclusions of law.

## II. Findings of Fact[6]

### A. *The Parties*

1. Plaintiff/Counter-Defendant Tim Hortons USA Inc. ("THUSA") is a Delaware corporation with its principal place of business in Miami, Florida. (JPS at ¶ 5A). THUSA franchises TIM HORTONS® brand stores in the United States that are involved in, among other things, the sale of selected foods and beverages, mainly coffee and donuts. (JPS at ¶ 5H).

2. Plaintiff/Counter-Defendant Tim Donut U.S. Limited, Inc. ("TDUSL") is a Florida corporation with its principal place of business in Miami, Florida. (JPS at ¶ 5B). TDUSL is affiliated with THUSA and is the owner of real property upon which some of

---

[5]     RUPERT M. BARKOFF ET AL., FUNDAMENTALS OF FRANCHISING 333 (4th ed. 2015). In this same section, the treatise also recommends that franchisee counsel "advise the client of uncontrollable risks that are unique to the status of being a franchisee[.]" *Id.* In a later chapter on "Dispute Resolution," the treatise explains that "[o]n balance, the case law has not been very kind to franchisees" and notes that one reason for this is that "franchise agreements are tilted in favor of the franchisor, and courts are disposed to enforce contracts as written." *Id.* at 352.

[6]     Exhibits admitted at trial are referred to as "Ex __", and are found at ECF No. 132. The Joint Pretrial Stipulation is referred to as "JPS at __", and is found at ECF No. 99.

THUSA's franchisees, including Defendants, operate their stores. (JPS at ¶ 5I).

3. Defendant/Counter-Plaintiff Panagg Café Incorporated ("Panagg") is a New York corporation with its principal place of business in Irondequoit, New York. (JPS at ¶ 5C). Defendants/Counter-Plaintiffs Gurvinder Singh ("Singh"), Ashna Walia, and Adarsh Walia (collectively "Guarantors") are citizens and residents of the State of New York and are Panagg's President, Vice President, and Secretary, respectively. (JPS at ¶ 5D–G).

4. Singh is an experienced businessman who, for most of his career, operated a successful international business manufacturing women's garments, which generated revenues of $52 million a year. [ECF No. 128, pp. 42:22–43:12, 79:18–20].

5. Singh created Panagg to operate the Tim Hortons store that is the subject of this case. [ECF No. 128, p. 44:15–25]. He focused on financial issues, while his daughter Ashna focused on operations. [ECF No. 128, p. 45:7–12].

**B.** *The Applicable Agreements*

6. Beginning December 2011, Panagg owned and operated a franchised TIM HORTONS® store, Store #7472 (the "Store") located at 1517 E. Ridge Road, Irondequoit, NY, in accordance with the terms and conditions of THUSA's Franchise Agreement, as amended (the "Franchise Agreement"). (JPS at ¶ 5J); (Ex. J-1).

7. Panagg also leased the premises upon which the Store is located from TDUSL under a December 2011 lease agreement ("Lease"). (JPS at ¶ 5K); (Ex. J-3).

8.      According to the Franchise Agreement Guarantee (Ex. J-2) and the Lease Guarantee (Ex. J-4) (collectively the "Guarantees"), the Guarantors jointly, severally, absolutely, and unconditionally guaranteed the payment and performance of Panagg's obligations to THUSA and TDUSL under those agreements. (JPS at ¶ 5L–M).

9.      Under the terms of the Franchise Agreement, Panagg was required to pay THUSA a royalty of 4.5% of weekly gross sales for use of the TIM HORTONS® System and the THUSA Marks. (JPS at ¶ 5N); [ECF Nos. 128, p. 45:14–22; 129, p. 214:8–10]. Additionally, the Franchise Agreement obligated Panagg to pay THUSA 4% of Panagg's monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and related expenditures made by THUSA. (JPS at ¶ 5N); [ECF No. 129, p. 214:8–16].

10.      Under the Lease, Panagg was obligated to make monthly payments to TDUSL of 8.5% of gross sales as rent for the Store premises. (JPS at ¶ 5O); [ECF Nos. 128, p. 46:1–5; 129, p. 214:8–10]. Panagg was also obligated to pay TDUSL all taxes, assessments, and charges imposed in connection with the ownership, occupancy, or possession of the Store. (JPS at ¶ 5O). Panagg did not **directly** pay the taxes to the local government, but rather, was required to pay TDUSL for the taxes TDUSL had paid. [ECF No. 128, p. 46:10–20].

11.      The Lease is a net lease, and Panagg was obligated to pay TDUSL rent, as well as all costs, expenses, and obligations relating to or affecting the subject property.

(JPS at ¶ 5P). Paragraphs 7(c) and 7(d) of the Lease specifically required Panagg to pay TDUSL when due, as additional rent, all real property, school, and local improvement taxes charged, assessed, or levied against the subject property, and if Panagg contested a tax assessment, then Panagg was required to pay the taxes owing to TDUSL in trust pending such appeal. (JPS at ¶ 5Q).

12.     Singh understood that the obligations to pay Plaintiffs royalties, advertising, and rent were important provisions in his agreements and that these obligations were also important to Plaintiffs. [ECF No. 128, p. 47:5–14].

13.     The Franchise Agreement provides that Panagg's failure to comply with a provision of the Franchise Agreement constitutes a default, and if Panagg failed to cure the default after any required notice and within the applicable cure period, then THUSA could, at its option and without prejudice to any other rights or remedies, terminate the Franchise Agreement. (JPS at ¶ 5S).

14.     Paragraph 12.01(s) of the Franchise Agreement provides for financial defaults to be cured within 5 days after receipt of written notice. (JPS at ¶ 5T).

15.     The Lease provides that if the Franchise Agreement is terminated, the Lease shall also be terminated. (JPS at ¶ 5U).

16.     Both the Franchise Agreement and Lease contain non-waiver clauses. (Exs. J-1 at § 18.00; J-3 at § 30).[7]

---

[7]     The Franchise Agreement provides, in pertinent part:

17.    The Franchise Agreement also says, "Time is of the essence in this Agreement." (Ex. J-1 at § 18.03(c)).

**C.    *Defendants' Delinquent Payments***

18.    Panagg began to fall behind in its payments to Plaintiffs in 2014. [ECF No. 128, pp. 47:15–17, 48:6–7]. The difficulty stemmed from, among other things, an increase in local taxes. [ECF No. 128, p. 47:18–25].

19.    Although atypical and without any obligation to do so under the Lease,

---

No delay, waiver, omission, or **forbearance on the part of Franchisor** to exercise any right, option, duty, or power arising out of this Agreement against Franchisee or any franchisee, or out of any breach or default by Franchisee, or by any other franchisee, of any of the terms, provisions, or covenants of this Agreement or any other Franchise Agreement, **nor any custom or practice** of Franchisor or Franchisee at variance with the terms hereof shall constitute a waiver by Franchisor to enforce any such right, option, or power as against Franchisee, or as to subsequent breach or default by Franchisee. **Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver** by Franchisor of any preceding or succeeding breach by or obligations of Franchisee of any terms, covenants, or conditions of this Agreement.

**(**Ex. J-1 at § 18.00 (emphasis added)).

The Lease provides:

Any condoning, excusing or overlooking by either party hereto of any default, breach or non-observance by the other party at any time or times in respect of any covenant, proviso or condition herein contained shall not operate as a waiver of any rights hereunder in respect of any subsequent default, breach or non-observance.

(Ex. J-3 at § 30).

TDUSL assisted Defendants in obtaining a reduction of their real estate taxes and agreed to delays in payments for a period of time. (Ex. D-3); [ECF No. 129, p. 19:5–7].

20.     For more than one year, Plaintiffs accepted weekly partial payments from Panagg. (Exs. D-2; P-6); [ECF No. 128, pp. 60:18–21, 108:3–24]. On a weekly basis, the franchisor's personnel would email Singh the amount due, breaking down arrears and new payment obligations, and Singh would provide the amount he would pay and authorize an ACH electronic payment from his bank account. (Exs. D-2; P-6); [ECF No. 128, pp. 60:18–21, 108:3–24].

21.     But even though Plaintiffs accommodated Defendants' failure to timely pay for a time, Defendants were notified in February 2016 that the old debt had to be paid down by April 2016, if not before. (Ex. P-6).

22.     Singh requested a payment plan for the old debt, but he acknowledges that the parties never entered into an actual payment plan. [ECF No. 128, pp. 62:5–7, 63:5–21, 64:13–22].

**D.     *Operational Issues Develop***

23.     In March and April 2016, Monroe County cited the Store for numerous violations, including inadequate insect and rodent control, significant fly infestation, the presence of rodents, and sanitation issues. (Exs. P-8, P-9, P-10, P-11); [ECF No. 128, pp. 142:8–146:21]. Defendants did not provide these reports to Plaintiffs. [ECF No. 128, pp. 146:23–148:8].

10

24.     During the same period, THUSA employees discovered similar issues, observing cleanliness issues and stale food at the Store. (Ex. P-7); [ECF No. 129, pp. 23:4–6, 24:2–10].

25.     On July 7, 2016, an independent firm, Steritech, performed a routine inspection of the Store on THUSA's behalf, revealing critical safety issues, including a dead mouse, rodent droppings, flies, and mold in the ice machine. [ECF No. 129, pp. 25:21–26:10, 29:1–8].

26.     On the afternoon of July 7, 2016, THUSA's former Director of Franchise Performance, Chris Kennedy, suggested that Panagg temporarily close the Store due to the operational violations, and Panagg agreed to close the Store. (JPS at ¶ 5W); [ECF No. 128, pp. 112:7–113:13].

### E.     *Defaults are Declared*

27.     On July 7, 2016, Plaintiffs sent via email and overnight delivery two notices of default to Defendant: one for operational default and another for financial default. (JSP at ¶¶ 5X–AA); (Exs. J-11, J-12, J-13).[8]

28.     THUSA's in-house counsel Robin Schafer was tasked with "send[ing] the default letter for the operations default, which then turned into an operations and a financial default." [ECF No. 129, p. 59:7–11].

29.     Both default notices say that they could be modified only by written

---

[8]     The parties agreed that the default notices were sent to the appropriate recipients through an acceptable form and received on July 7, 2016. (JSP at 7D).

communications under Schafer's signature or another THUSA attorney's signature and that Defendants could not rely on any oral communications. (Exs. J-12, J-13). Singh testified that he understood these modification limitations. [ECF No. 128, pp. 52:23–53:12]. Schafer testified that this non-modification provision is included in the default notices to control the flow of communications and thus prevent inconsistent communications between the franchisor's employees in the field and the franchisee. [ECF No. 129, pp. 65:17–66:5].

30.     The financial default notice demanded payment of $66,610.83, a debt that had accumulated for seven or eight months. (Ex. J-13); [ECF No. 128, pp. 55:17–56:25]. Of that amount, however, approximately $1,830 was not past due on July 7, 2016, although the obligations had accrued as of that date. (Exs. P2, P3); [ECF No. 129, pp. 177:10–178:18].

31.     The financial default notice provided that if the amounts were not paid in full within five days of receipt of the notice, then the Franchise Agreement would terminate upon written confirmation. (JPS at ¶ 5FF); (Ex. J-13).

32.     On the morning of July 7, 2016, Singh received an email from a THUSA accounts receivable administrator informing Singh of the outstanding debt and asking how much he wanted to pay that week. (Ex. D-2); [ECF No. 128, pp. 109:5–110:21]. Singh authorized a payment of $6,700, and on July 11, 2016, Plaintiffs withdrew $6,693.77 from Panagg through the ACH process. (JPS at ¶ 5II); (Ex. D-2); [ECF No. 128, p. 110:18–21].

33. Singh testified that he understood that the financial default notice was a very serious letter and that the Franchise Agreement could be terminated if Defendants did not pay within 5 days of receiving the financial default notice. [ECF No. 128, p. 58: 7–16].

34. Singh also testified that he knew that, notwithstanding the emails the morning of July 7th from the THUSA accounts receivable administrator, Plaintiffs were looking for payment of **all** of the amounts due in the financial default notice. [ECF No. 128, p. 74:4–17]. Singh also acknowledged at trial that Plaintiffs had the right to demand full payment even if they accepted partial payments over time. [ECF No. 128, pp. 75:4–76:3].

35. Singh received the default notices on July 7, 2016, within an hour of being emailed. (JPS at ¶ 5Z). Default notices were also delivered to Singh, Adarsh Walia, and Ashna Walia by Federal Express on July 8, 2016. (JPS at ¶ 5EE).

36. Payment was not made within the five-day cure period, which expired on July 12, 2016. [ECF No. 128, p. 52:16–22].

## F. *Defendants' Response to the Defaults*

37. When Singh received the default notices, he was already suspicious of Plaintiffs and felt that the financial default was some sort of trap, so he hired a lawyer. [ECF No. 128, p. 57:11–25].

38. On July 9, 2016, Singh emailed Kennedy -- the former THUSA Director of

Franchise Operations -- requesting an inspection of the restaurant for operational defaults. (Ex. J-15).

39.     Kennedy responded that any questions regarding the default letters should be directed to Schafer. (Ex. J-15). Singh acknowledged at trial that he knew that he was not to discuss financial issues with Kennedy and that he should direct all questions or concerns regarding the default notices to Schafer. [ECF No. 128, pp. 149:4–150:4].

40.     Kennedy's email also said that he would be at the July 13th inspection to confirm "whether you have cured the defaults." (Ex. J-15). Singh testified that he knew Kennedy was referring to the multiple *operational* defaults and not the financial defaults. [ECF No. 128, p. 51:5–14].

41.     On July 10, 2016, Defendants' initial counsel, Nixon Peabody, emailed a letter to Schafer in response to the default notices. (Ex. J-16).

42.     The letter asserted that Defendants did not have the ability to pay on an accelerated basis what the financial default notice demanded. (Ex. J-16). But Singh acknowledged at trial that he, in fact, had the money to pay, albeit in his personal retirement account. [ECF No. 128, pp. 58:17–21, 69:13–25].

43.     The letter also asserted that the parties had entered into a payment plan. (Ex. J-16). Singh, however, also testified that the parties never entered into a payment

plan. [ECF No. 128, pp. 62:5–7, 63:5–21, 64:13–22].[9]

44.     The Nixon Peabody letter also threatened litigation if Plaintiffs sought to enforce their rights. (Ex. J-16).

45.     Schafer testified that, in her experience as a franchise attorney, this aggressive response was unique -- because a typical response to a financial default is immediate payment or an explanation for why the franchisee cannot pay. [ECF No. 129, pp. 64:16–65:16].

46.     On Monday, July 11, 2016, the franchisor withdrew from Panagg a payment of $6,693.77 through the ACH process. (JSP at ¶ 5II).

47.     By letter dated July 12, 2016, THUSA's counsel responded to the Nixon Peabody letter, requesting evidence of the "payment plan" referenced by Defendants' counsel. (JPS at ¶ 5JJ); (Ex. J-17).

48.     By letter dated July 13, 2016, which was emailed to Defendants at 11:07 A.M., THUSA notified Defendants that the Franchise Agreement and Lease terminated on July 13, 2016 because Plaintiffs did not cure the financial default by July 12, 2016.

---

[9]     The Court is not necessarily suggesting that the Nixon Peabody firm is to blame for this misstatement. Attorneys rely on information received from their clients. If clients provide incorrect information, then it is not illogical to predict that the attorneys would also act on that incorrect information. Moreover, attorneys often send drafts of demand letters to their clients before sending them out to ensure the accuracy of the factual representations made in the letters. But this trial did not produce evidence on the issue of whether the attorneys received incorrect information from their client (or clients) or if their clients reviewed a draft of the response letter and approved it.

(JPS at ¶ 5LL); [ECF No. 128, p. 71:16–18].[10]

49.     At 2:45 P.M. the same day, via email from its counsel, Panagg offered to pay the amount demanded in the financial default notice and requested that THUSA provide wire instructions to send the payment. (JPS at ¶ 5MM); (Ex. D-10); [ECF No. 128, p. 71:6–18].

50.     On July 13, 2016, at 3:30 P.M., by letter from its counsel, THUSA rejected the offer and confirmed the franchise's termination. (JPS at ¶ 5NN).

51.     A few weeks after terminating Panagg's franchise, THUSA offered the store to Ninety Rock, but Ninety Rock rejected the offer, and the Store remains vacant. [ECF No. 129, p. 68:3–70:5].

**G.     *Plaintiffs' Damages***

52.     Himanashu Chaturvedi, Plaintiffs' Senior Manager of Finance, prepared Ex. P-2, which shows past due amounts owed to Plaintiffs, and Ex. P-3, which contains the back-up invoices. (Exs. P-2, p-3); [ECF No. 129, pp. 167:13–18, 173:11–174:5].

53.     As of July 15, 2016, Defendants owed Plaintiffs $59,917.06 for royalties, rent, property taxes, advertising, and other items. (Ex. P-2); [ECF No. 128, pp. 48:17–49:1].

54.     Chaturvedi also calculated Plaintiffs' lost profits through the end of 2017. [ECF No. 129, pp. 178:20–179:2]. Assuming a 2.5% sales growth rate and an 8% discount

---

[10]     The parties agreed that the termination notice was sent to the appropriate recipients through an acceptable form and received on July 13, 2016. (JSP 7E).

rate, he opined that Plaintiffs' lost profits through the end of 2017 would amount to

$219,537.23. (Ex. P-17).[11]

## III. Conclusions of Law[12]

### A. *Plaintiffs are Entitled to Judgment Against Defendants*

"The elements of a breach of contract action are (1) a valid contract; (2) a material

breach; and (3) damages." *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir.

1999).

### i. Failure to Timely Pay Constitutes a Material Breach

In their proposed findings of fact and conclusions of law, Defendants say that the

email termination notice was "surprising" [ECF No. 134-1, p. 3], but the Court

disagrees. The *termination* was not a surprise. The default notice expressly advised that

termination would occur if full payment was not made within the five-day cure period,

and the payment was not made. Perhaps the *initial* default notice letter was surprising

because Panagg had been in default for many months and had not previously received

such a default letter. Perhaps Panagg or its counsel thought that their response letter

would pressure Plaintiffs into adopting a more-flexible approach toward the default or

---

[11]    The Court permitted Chaturvedi's testimony only *provisionally*. The Court
permitted defense counsel to pursue a full-fledged cross-examination and advised that
the parties would be "hold[ing] [their] breaths for the evidentiary ruling[.]" [ECF
No. 129, pp. 207:4–208:]. As outlined below, the Court ultimately concludes that
Chaturvedi's testimony about lost profits is inadmissible.

[12]    The parties agreed that Florida law applies. (JSP at ¶ 7C).

cause them to postpone the termination. But the termination itself should not have been a surprise. Plaintiffs did exactly what their attorney said they would do in the default notice letter.

Defendants acknowledge that Plaintiffs have the right to terminate the Franchise Agreement and Lease upon a material breach [ECF No. 106, p. 9], but they claim that their failure to pay Plaintiffs monies owed since November 2015 is not material or is insufficient to permit termination. This legal position is contrary to Singh's acknowledgement at trial that the required payments are an important part of the agreements. [ECF No. 128, p. 47:5–14]. Moreover, it is contrary to law.

Under Florida law, failure to make a timely payment constitutes a material breach where time is of the essence. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.,* 420 F.3d 1146, 1151 (11th Cir. 2005) (applying Florida law). Time is of the essence in four instances: when "(1) the agreement explicitly so specifies; or (2) such may be determined from the subject matter of the contract; or (3) treating time as non-essential would produce a hardship; or (4) notice has been given to the defaulting party requesting performance within a reasonable time." *Id.*

Here, Section 18.03(c) of the Franchise Agreement contains a time is of the essence clause. (Ex. J-1 at § 18.03(c)). In addition, Plaintiffs served Defendants with a default notice requiring payment within five days of receipt. (Ex. J-13). Accordingly, Defendants' failure to timely pay constituted a material breach. *See, e.g., Burger King*

*Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1274 (S.D. Fla. 2002), *aff'd sub nom.* 103 F. App'x 666 (11th Cir. 2004) (granting summary judgment in favor of franchisor for breach of contract where franchisee **failed to pay** royalties, advertising payments, and property taxes **after receiving default notice**).

Defendants rely on *Ron Matusalem & Matusa of Florida, Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547 (11th Cir. 1989) and claim that under Restatement of Contracts § 241, their failure to pay is not material. [ECF No. 134-1, p. 17]. Although Defendants contend that their breach was minor because they offered to pay after the cure period expired, "[t]here is almost always no such thing as 'substantial performance' of payment between commercial parties when the duty is simply the general one to pay. Payment is either made in the amount and on the due date, or it is not." *Treasure Coast, Inc. v. Ludlum Const. Co.*, 760 So. 2d 232, 234–35 (Fla. 4th DCA 2000) (internal citations omitted). Moreover, *Ron Matusalem* was not a payment default case; it addressed whether a franchisee's use of commercial and not natural extracts to make rum constituted a material breach. *Ron Matusalem*, 872 F.2d at 1551–52.

Restatement of Contracts § 241 also does not support Defendants, whose breach is material because the failure to pay will deprive Plaintiffs of the benefit they reasonably expected: to be paid for use of their trademarks and system and to be able to terminate should the amounts not be timely paid.[13] Although Defendants contend that

---

[13]     Restatement of Contracts § 241 provides that the following factors should be

the result is a forfeiture if the breach is material, Defendants knew -- and the financial

default notice provided -- that termination could result if they failed to timely pay.

Finally, Defendants' failure to perform did not comport with standards of good faith

since they knew when the payment was due and still failed to pay.

In sum, Defendants' failure to timely pay the amounts demanded in the financial

default notice was a material breach of the Franchise Agreement.

### ii.  The Agreements Authorize Termination For Failure to Pay

When unambiguous, contracts are to be given their plain and ordinary meaning.

*Vernon v. Resolution Tr. Corp.*, 907 F.2d 1101, 1109 (11th Cir. 1990) (applying Florida law).

The agreements here make plain that Plaintiffs have the right to terminate if a financial

default is not timely cured. (Ex. J-1 at § 12.01(s)); (JPS at ¶5S, 5T, 5U).

Defendants contend that termination of the franchise would constitute forfeiture.

---

considered in determining whether a breach is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981).

But "[w]hile forfeitures are not favored, a forfeiture will be enforced where it is clear that the parties intended such a result." *Stoltz v. Truitt*, 940 So. 2d 521, 523 (Fla. 1st DCA 2006) (citing *Nelson v. Hansard*, 197 So. 513, 513–14 (Fla. 1940)); *see also Waksman Enters., Inc. v. Oregon Props., Inc.*, 862 So. 2d 35, 41–42 (Fla. 2d DCA 2003) (holding that the principle "the law abhors a forfeiture" may not "be used to justify an interpretation of a contract that ignores the plain meaning of the text of the contract.").

Defendants contend that a short delay in performing their obligations should not lead to forfeiture, and they rely on out-of-state decisions (not based on Florida law) for this proposition. But here, the delay was not short: Defendants were seven or eight months behind and knew that Plaintiffs wanted payment in full on July 12. Plaintiffs' clear contractual right of termination should be enforced. Plaintiffs did not lose their contractual right to terminate merely because Panagg's initial counsel stridently contended that termination was legally unavailable, that Plaintiffs were estopped for terminating, and that Panagg reserved its right to sue for damages should Plaintiffs follow through and issue a termination notice.[14]

Therefore, based on Defendants' failure to cure their financial default, Plaintiffs had the right to terminate the franchise.

---

[14]    *Cf.* TODD RUNDGREN, *You Cried Wolf, on* HERMIT OF MINK HOLLOW (Bearsville 1978) ("You cried wolf once too often / You cried wolf, you made me run / You cried wolf, I caught you bluffing / You'll cry wolf but I'll be gone").

### iii.    Belated "Offer" to Pay Is Insufficient

As a preliminary matter, the parties dispute whether the issue of whether Defendants' post-termination attempt to cure on July 13, 2016 (Ex. D-10) was a valid legal tender, preserved for the Court's determination. Defendants contend that "[t]he sufficiency of the tender, as distinguished from the timing of the tender, was not raised" by Plaintiffs "nor included as an issue to be litigated in the Joint Pretrial Statement." [ECF No. 134-1, p. 13 n. 4]. But Plaintiffs believe otherwise, and so they describe the July 13, 2016 email as "nothing more than an offer to pay the amount demanded, not a legal tender." [ECF No. 136, p. 13].[15]

Under Florida law, a tender is defined as "an unconditional offer of payment consisting in the actual production, *in current coin of the realm*, of a sum not less than the amount due on a specific debt or obligation." *Rissman on Behalf of Rissman Inv. Co. v. Kilbourne*, 643 So. 2d 1136, 1140 (Fla. 1st DCA 1994) (emphasis in original). "The only distinction between tender and payment lies in the fact that a tender is not accepted,

---

[15]    In an Endorsed Order after the bench trial, the Court required the parties' proposed findings of facts and conclusions of law to "include an analysis of whether *tender* of payment, as opposed to an <u>actual</u> payment, is sufficient to avoid termination of a franchise based on a financial default." [ECF No. 120 (emphasis in original)]. It also required a discussion of "whether the letter from defense counsel was actually a tender or merely a promise to pay money in the future (given that a check was not actually included with the letter and given that funds were not actually transferred or drawn down on an account[)]."[ECF No. 120]. Defendants filed a formal objection to the issue of the sufficiency of the July 13, 2016 tender and argued that it "cannot be used as a justification for the termination of the franchise at this post-trial point in the case." [ECF No. 134, p. 2].

while a payment is." *Id.* "To make an effective tender, the debtor must actually attempt to pay the sums due; **mere offers to pay**, or declarations that the debtor is willing to pay, **are not enough**." *Distribution Mgmt. Servs., Inc. v. S. Waste Sys., Ltd.*, 948 So. 2d 6, 12 (Fla. 3d DCA 2006) (emphasis added) (quoting *Southfork Invs. Grp., Inc. v. Williams*, 706 So. 2d 75, 79 (Fla. 2d DCA 1998)).

Here, the July 13, 2016 email is a mere offer to pay, not a legal tender. There is no evidence that, along with the email, Defendants actually produced "current coin of the realm," in whatever form, to Plaintiffs. *Rissman*, 643 So. 2d at 1140. Indeed, the email shows otherwise; after stating that Defendants are willing to pay, it asks for wire instructions to send the payment, demonstrating that a payment was not actually sent along with the email. (Ex. D-10).

But even if the sufficiency-of-tender issue was not preserved, then the ruling still goes in Plaintiffs' favor because the July 13, 2016 offer (even if deemed a tender) was late. *See Sun Bank of Miami v. Lester*, 404 So. 2d 141, 143 (Fla. 3d DCA 1981) (holding that the plaintiff's attempt to cure "came too late" where she sent a check two-days late for an additional deposit under a purchase agreement, which said that time was of the essence). Had Defendants submitted their offer to pay **before** receiving notice of the termination and before the cure period expired, then the scenario would be significantly different. But that is not what happened. Instead, the franchisee's initial counsel took the position that no termination could occur and that Defendants lacked the money to

pay the amounts owed -- and then performed a legal (and factual) about-face after the termination letter was received by offering to have the full amount paid.

In short, the post-termination July 13, 2016 offer to pay did not prevent Plaintiffs from terminating the franchise.

### iv.     The Financial Default Notice was not Defective

Defendants contend that the financial default notice is invalid because $1,837.94 of the amount demanded was owed but not yet past due on July 7, 2016. Defendants do not dispute that they owe $59,917.06, only that $1,837.94 was incurred but not due until later in July. (Exs. P2, P3); [ECF No. 129, pp. 177:10–178:18].

**Substantial compliance**, however, is all that is required for notices of default, and substantial compliance exists even if the amount demanded in the default notice is incorrect. *See Suntrust Bank v. Ruiz*, 648 Fed. Appx. 757, 760 (11th Cir. 2016) (interpreting Florida law as holding that "conditions precedent requiring notice of default are evaluated for 'substantial compliance' or 'substantial performance'") (citing *Green Tree Serv., LLC v. Milam*, 177 So. 3d 7, 14, 16–17 (Fla. 2d DCA 2015)); *see also In re Volpe Enters., Inc.*, 23 B.R. 818, 820 (Bankr. S.D. Fla. 1982) (upholding termination of franchise agreement even though a default notice did not correctly credit royalty payments actually made, because "defendant subsequently was in default at many times, and it has not demonstrated through testimony or through the documents in evidence that the defaults would not have existed if payments had properly been credited.").

In this case, Defendants cannot dispute that they owed the entire $59,917.06, just not all on July 7th. Moreover, even if the $1,837.94 that was due on a later date was removed from the financial default notice, Defendants would *still* be in default under their agreements. Accordingly, the financial default notice was not defective.

### v. No Waiver or Estoppel

Defendants contend that Plaintiffs waived their right to, and are estopped from, declaring a default on July 7th for two reasons: (1) because of the July 11th $6,693.77 ACH withdrawal by the THUSA accounts receivable administrator and (2) because Panagg was notified on July 11th about the conclusion of the tax appeal. [ECF No. 106, p. 7]. These arguments are unpersuasive.

### 1. *Non-Waiver Clause Bars Defenses*

Non-waiver provisions are valid and enforceable and they preclude waiver and estoppel defenses as a matter of law. *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1270–71 (11th Cir. 1999) (holding that defendant's waiver argument, which was based on the plaintiff's acceptance of late payments for a two-year period without objection, failed where the contract contained an anti-waiver provision); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991) (enforcing anti-waiver provision in a franchise case); *Rybovich Boat Works, Inc. v. Atkins*, 587 So. 2d 519, 522 (Fla. 4th DCA 1991) (holding that "[b]ecause the contract was unambiguous, buyer's affirmative defenses of waiver and estoppel were defeated as a matter of law by the provisions of

the contract itself," which included an anti-waiver provision).

The Franchise Agreement in this case contains a non-waiver clause that specifically provides that the subsequent acceptance of any payments due shall not be deemed a waiver of any preceding or succeeding breach by the franchisee. (Ex. J-1 at § 18.00). The July 11th $6,693.77 payment was for current royalties and current advertising due under the Franchise Agreement, but not for the **past due** amounts. [ECF No. 128, p. 160:19–22]; (Exs. D-2, D-16). The July 11th payment, therefore, did not preclude Plaintiffs from pursuing their default based on Defendants' other financial breaches.

Defendants' reliance on *In re S & I Investments*, 421 B.R. 569 (Bankr. S.D. Fla. 2009) and *W. World, Inc. v. Dansby*, 603 So. 2d 597, 601 (Fla. 1st DCA 1992), are misplaced. Both courts recognized that non-waiver clauses will be enforced where the non-waiver clause specifically states that certain conduct will not constitute a waiver. *In re S & I Invs.*, 421 B.R. at 581 ("The Court of Appeals for the Eleventh Circuit has recognized that anti-waiver provisions can be enforceable and have been upheld by Florida courts."); *Dansby*, 603 So. 2d at 601 (distinguishing broader yet enforceable anti-waiver provisions because "the contractual language in the instant case does not specify that certain types of behavior will not constitute a waiver.").

Here, the non-waiver clause specifically addresses the subject of acceptance of subsequent payments and provides that "[s]ubsequent acceptance by Franchisor of any

payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by or obligations of Franchisee of any terms, covenants, or conditions of this Agreement."(Ex. J-1 at § 18.00).

In sum, the Franchise Agreement's non-waiver provision bars Defendants' waiver and estoppel defenses.

### 2. *Alleged Course of Conduct Argument Fails*

Defendants also argue that a "course of dealing" prevented Plaintiffs from declaring a default on July 7th and a termination on July 13th. [ECF No. 106, p. 8 n. 3]. This claim fails as well. Under Florida law, while course of dealing may help explain an **ambiguous** contract, "course of dealing cannot override express contract terms." *Indian Harbor Citrus, Inc. v. Poppell*, 658 So. 2d 605, 606 (Fla. 4th DCA 1995) (rejecting course of dealing theory employed to alter terms of unambiguous contract); *see also Rybovich*, 587 So. 2d at 521–22 (holding that trial court erred in using parties' course of dealings to vary terms of written contract where contract was unambiguous and contained anti-waiver clause).

In this case, the payment accommodations Plaintiffs provided did not erase Defendants' old debt. Singh testified that he understood on receipt of the financial default notice that Plaintiffs were demanding all the money due by July 12, 2016. [ECF No. 128, p. 74:4–17]. Singh also acknowledged at trial that Plaintiffs had the right to demand full payment even if they previously accepted partial payments over time.

[ECF No. 128, p. 75:4–76:3]. Moreover, although Singh *requested* a payment plan for the old debt, he acknowledged at trial that the parties never entered into an actual payment plan. [ECF No. 128, pp. 62:5–7, 63:5–21, 64:13–22]. Additionally, both the Franchise Agreement and the Lease provide that they cannot be amended or modified absent a writing executed by both parties. (Exs. J-1 at § 18.02, J-3 at § 58).

Therefore, the parties' prior course of conduct did not prevent Plaintiffs from declaring a default on July 7th and a termination on July 13th.

### 3.    *No Detrimental Reliance*

Defendants' estoppel defense also fails because they cannot show detrimental reliance. To prevail on an estoppel defense, a defendant must show

> (1) representation of a material fact by the party estopped to the party claiming the estoppel that is contrary to the fact later asserted by the estopped party; (2) reliance on that representation by the party claiming the estoppel; and (3) the party claiming the estoppel detrimentally changed their position due to such reliance.

*Zurstrassen v. Stonier*, 786 So. 2d 65, 68–69 (Fla. 4th DCA 2001).

Here, Singh testified that, despite the prior weekly payments, he understood that Plaintiffs were demanding all money due by July 12, 2016. [ECF No. 128, p. 74:4–17]. Singh further testified that he was long suspicious of Plaintiffs and that he immediately hired a prominent law firm upon receipt of the default notices because he thought he was being set up. [ECF No. 128, p. 57:11–25]. Thus, the prior payments did not lull Defendants into a false sense that Plaintiffs would not terminate the franchise. Rather,

Defendants stood ready to fight and threatened litigation if Plaintiffs enforced their rights. (Ex. J-16).

Therefore, Defendants cannot prove the detrimental reliance element of their estoppel defense.

### vi. Tax Assessment Appeal Did Not Preclude Financial Default Notice

Defendants claim that § 12.01(s) of the Franchise Agreement deferred their obligations under the Lease to pay the taxes to TDUSL while they were appealing certain tax assessments. That provision allows for termination of the Franchise Agreement:

> If, within five (5) days after receipt of written notice from Franchisor that any payment due from the Franchised Business is overdue, Franchisee does not make such payment in the requested amount to Franchisor, an affiliate of Franchisor, or to Franchisee's suppliers or creditors, unless, **with respect to Franchisee's suppliers or creditors**, Franchisee notifies Franchisor of the existence of a *bona fide* dispute and takes immediate action to resolve it[.]

(Ex. J-1 at § 12.01(s) (emphasis added)).

The exception in section 12.01(s), however, applies only to the "franchisee's suppliers or creditors," and Monroe County/Town of Irondequoit is not a creditor or supplier of **Panagg**, the franchisee, since the property is owned by TDUSL. Additionally, section 12.01(s) does not apply to property taxes due under the Lease. Rather, the Lease contains a specific provision requiring payment to TDUSL (in trust) even if Panagg wished to contest any tax assessment. (Ex. J-3 at § 7(d)); [ECF No. 129,

p. 74:18–76:12].

Accordingly, the tax assessment did not preclude Plaintiffs' financial default notice.

### vii. No Duty to Mitigate

Under Florida law, a franchisor does not have an obligation to minimize losses or mitigate damages where the franchise agreement is a non-exclusive contract. *Burger King Corp. v. Barnes*, 1 F. Supp. 2d 1367, 1372 (S.D. Fla. 1998) ("When a non-exclusive contract is involved which would allow a plaintiff to enter into other similar contracts, an exception to the requirement of avoiding foreseeable consequences is created and there is no duty to mitigate or minimize losses."). The Franchise Agreement here is a non-exclusive contract. (Ex. J-1 at § 1.01 ("Franchisee expressly acknowledges and agrees that the rights granted it by this Agreement are non-exclusive.")). Therefore, Plaintiffs had no duty to mitigate damages.

In any event, the evidence at trial showed that Plaintiffs have nonetheless attempted to minimize their losses -- by negotiating for the sale of the Store to two other franchisees. [ECF No. 129, pp. 68:3–70:5]. And although a sale has not yet been completed, Plaintiffs have limited their future damages to the end of 2017. (Ex. P-17).

In short, Defendants' mitigation of damages defense is unavailing.

**B.** *Amount of Judgment for Plaintiffs*

    **i.** **Past Due**

Plaintiffs are entitled to recover $59,917.06 for amounts owed as of July 2016. (Ex. P-2).

    **ii.** **Future Lost Profits**

        **1.** **Chaturvedi's Lay Opinion Testimony Is Inadmissible**

Plaintiffs are not, however, entitled to future lost profits damages because the sole witness they called to support their claim provided inadmissible testimony. A lay witness, Chaturvedi works for THUSA as a senior manager of finance. But Plaintiffs did not make an expert witness disclosure for him, nor did they provide an expert witness report. Instead, they relied on Federal Rule of Evidence 701, concerning opinion testimony by a lay witness, and Federal Rule of Civil Procedure 26(a)(2)(B), concerning the situations when a party must provide a report.

Rule 701 limits lay testimony in the form of an opinion to that which is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

The advisory committee note to the rule, however, does allow an "owner or officer of a business to testify to the value or projected profits of the business, without

the necessity of qualifying the witness as an accountant, appraiser, or similar expert."

Fed. R. Evid. 701 (advisory committee's note) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (holding that the plaintiff's owner could give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business)). The Eleventh Circuit has recognized this exception to Rule 701. *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, Ltd., 320 F.3d 1213, 1223 (11th Cir. 2003) (holding that testimony by company's officers and employees about the reasonableness of repair charges and time to do repairs on ships, which was not based on specialized knowledge under Rule 702, was admissible under Rule 701).

Chaturvedi's trial testimony is not admissible under Rule 701 for several reasons. First, Chaturvedi is not testifying about his company's **own** "value or projected profits of the business" but, rather, he opines about *another* business -- the Panagg franchise. As the limited exception of Rule 701 is to allow an officer or owner to testify about his or her business because the witness is deemed to have competent, personal knowledge to support the lay opinion, Chaturvedi's testimony does not meet that exception.

Second, Chaturvedi had no personal knowledge of Panagg's business and therefore relies on a software algorithm which was not made available to the Defendants before or during trial. Specifically, he relied on two different software programs to conclude what the lost sales would be for the Store. One software program is Hyperion, which collected and reported raw sales data from each Tim Hortons

franchise. [ECF No. 129, pp. 170:17–171:12]. But to calculate projected sales, he used a software program called SAP "using the logic that we regularly rely on for estimating sales if certain restaurants do not submit sales on time." [ECF No. 129, p. 179:3–19]. The SAP system uses an "algorithm" to project what sales would be. [ECF No. 129, p. 183:5–21]. Therefore, he testified from an output of an algorithm.

Chaturvedi's use of a proprietary algorithm, which Plaintiffs never provided access to in discovery, undermined defense counsel's ability to effectively cross-examine this "lay" witness who never produced a report. As defense counsel argued, there was no way for him to know, for example, whether the "logic" employed by the SAP algorithm already presupposed sales increases, adjusted for weather and seasons, adjusted for geography, or any other similar factors.

So if Plaintiffs hoped to properly use the limited exception for lay witness testimony, then they were required to present a lay witness with personal knowledge about the calculations.

Third, on cross-examination, Chaturvedi could not answer questions to test the reliability of the algorithms. He accepted the SAP results in this case at face value. [ECF No. 129, pp. 227:19–228:22]. He concluded that because the historical invoices matched the SAP data for historical information in this case, that the future projections should be reliable, without explaining why. [ECF No. 129, p. 228:13–22]. He admitted that he did not do any analysis to calculate growth assumptions but relied on a spreadsheet given

to him. [ECF No. 129, p. 234:3–7]. He also used a template for calculating future damages, prepared especially for litigation. [ECF No. 129, p. 239:2–16].

Fourth, for all practical purposes, Chaturvedi is a lay witness using an undisclosed model for his damage testimony. Phrased differently, he is actually an expert witness who Plaintiffs unsuccessfully tried to dress up in the garb of a lay witness. Chaturvedi's use of an algorithm to support his so-called lay witness damages testimony about purported future lost profits is thus exactly the type of scenario that is not appropriate for lay witness testimony.

For example, in *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929–30 (10th Cir. 2004), the appellate court held that the testimony of a company's president about lost profits based on a damage model prepared in anticipation of litigation was inadmissible because the company's president was not qualified as an expert -- and only an expert witness could opine on a damages model that involved "technical, specialized subjects" not appropriate for lay opinion testimony under Rule 701. Here, the lay witness' reliance on an algorithm incapable of being the subject of effective cross-examination distinguishes this case from cases like *Lightning Lube*, where the business owner calculated lost profits based on his participation in the day-to-day affairs of the company.

Fifth, as referenced above in summary fashion, Chaturvedi's testimony goes beyond his personal knowledge and experience as a Senior Manager of Finance. [ECF

No. 129, pp. 169:21-170:16]. The assumptions built within this algorithm do not appear to be within his personal knowledge, but to be a composite of assumptions used by Plaintiffs' proprietary SAP enterprise software. Testimony based on such assumptions is typical of expert testimony, not lay testimony. *See In re MarketXT Holdings, Corp.*, No. 04-12078(ALG), 2011 WL 1422012, at *3 (Bankr. S.D.N.Y. Jan. 7, 2011) (finding that company's president's lost-profit lay testimony "based on a model that incorporates the types of assumptions used in an expert report" was inadmissible because it went "beyond his 'personal knowledge and his experience as [president] of the company' and enters a realm of calculation beyond the pale of lay opinion under Rule 701.").

Sixth, additional violations of Rule 701 occurred when Chaturvedi selected a growth rate and a discount rate but did not provide a report in advance of trial where the opinions and assumptions could be tested. Chaturvedi calculated a growth rate of 2.5 percent based on the fact that this location had years of negative growth, but he did not provide a report disclosing this or explaining his methodology prior to trial. [ECF No. 129, pp. 188:10–190:5].

Chaturvedi also, although not a purported expert, relied on hearsay assumptions regarding growth rates used elsewhere, such as by International Monetary Fund economists. [ECF No. 129, pp. 208:20–209:2]. His lay opinion, of necessity, was that if the IMF's economists' prediction of growth rate worldwide is correct, then it must also be correct for this location. But the substitution of a lay witness opinion for that of an

expert, such as an IMF economist, is not authorized by Rule 701.

In contrast, proper lay witness testimony might be provided using a historical perspective of a specific franchise, based on facts within the witness's own personal knowledge. For example, Singh might have been able to provide lay testimony about future lost revenues at his own franchise restaurant. But this type of an opinion was not presented in this case. Chaturvedi did not even test his assumed growth rate against the sales reported on Panagg's tax returns. [ECF No. 129, p. 230:15–18]. Rather, this lay witness opined like an economist, without actual knowledge "on the ground" of what is happening at this store.

Further, Chaturvedi's proffer of an 8% discount rate was based on a Bloomberg report. [ECF No. 129, p. 209:11–20]. The witness further added an improper opinion derived from a discussion of equity weighting of the *franchisor,* rather than the franchisee. [ECF No. 129, pp. 209:11–213:4]. He admitted that he does not, as part of his work, perform discount value analysis, but he used it anyway for his supposed lay opinion. [ECF No. 129, p. 244:10–14].

Seventh, Chaturvedi never performed a WACC (the weighted average cost of capital) analysis or use any other model for discount values for Plaintiffs. [ECF No. 129, pp. 244:18–245:13]. He could not answer whether the damages template prepared by Plaintiffs in anticipation of this litigation included analysis of internal rates of return; risk free rate of return; industry risk premium; size risk premium; company specific risk

premium; beta analysis; any analysis of the Rochester, New York market or geographic diversity; or other elements for calculating discount value. [ECF No. 129, pp. 246:2–251:9].

Chaturvedi's ignorance about these issues demonstrate that he is the wrong lay witness because he does not have enough personal knowledge about the business to answer questions about the specific support for his opinion testimony about future lost profits damages. More than an "expert in layperson's clothes," he was an expert witness expressing opinions marginally supported by hearsay, but unlimited in scope, unsupported by experience and training, and undisclosed by an expert's report.

Federal Rule of Evidence 602 requires a witness to testify from personal knowledge, and Rule 701 provides the limited occasion when a lay witness may provide an opinion. The testimony must be based on the witness' personal perception and it must *not* be based on scientific, technical, or other specialized knowledge.

Chaturvedi failed the personal knowledge requirement of Rule 602 as well as both of components of Rule 701. He was **given,** and did not personally prepare, the damages calculation for trial. He was given only enough information to provide conclusions, derived from a "template" prepared by others. [ECF No. 129, pp. 242:19–243:3].

Courts have rejected lay opinion testimony lacking a proper foundation. *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) ("In the realm of lost profits,

lay opinion testimony is allowed in limited circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company."); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81–82 (3d Cir. 2009) (holding that district court abused its discretion by allowing an employee to provide lay opinion testimony about lost earnings and pension benefits because employee lacked in-depth personal knowledge about the company); *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 565 (S.D. Tex. 2015) (finding that director's layperson opinion about the hotel's losses and damages was inadmissible because he lacked personal knowledge about the hotel's finances and accounting); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1273 (M.D. Ala. 2001) (explaining that "the accountant can crunch numbers, but the numbers, information, assumptions, and reasoning throughout the report must have been supplied by the witness, if he hopes to testify as to the same.").

In conclusion, Chaturvedi's testimony about lost profits is inadmissible.

### C.    *Plaintiffs are Entitled to Judgment on Defendants' Counterclaims*

In light of the Court's determinations above, judgment will be entered in favor of Plaintiffs on Defendants' counterclaims, which include breach of contract for wrongful termination, breach of the duty of good faith and fair dealing, estoppel, injunctive relief, and for a declaratory judgment. At bottom, Defendants argue that Plaintiffs acted capriciously and violated the duty of good faith in exercising their contractual rights

when Defendants failed to timely pay after notice and an opportunity to cure.

As discussed in this Order, Plaintiffs had the clear right to terminate the agreements for non-payment. Moreover, because Plaintiffs acted within their contract rights, they did not violate any implied contractual duties. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1317–18 (11th Cir. 1999) ("Where a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie."); *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998) (holding that alleged ulterior, improper motive for terminating franchise agreement was irrelevant where franchisee's material breaches of the franchise agreement justified termination).[16]

Based on this, the Court will soon separately enter judgment in Plaintiffs' favor for $59,917.06 for amounts past due. The Court will then consider any motion by Plaintiffs seeking attorney's fees or to tax costs. If Plaintiffs are entitled to costs or fees, then the Court will issue an amended judgment.

If Plaintiffs submit a motion to recover attorney's fees and costs and pursue fees and costs relating to their lost profits theory, then the motion should include an analysis of whether those efforts to obtain those types of damages are recoverable, given that Plaintiffs did not prevail on that claim. Naturally, if Plaintiffs decide to not seek fees and

---

[16] Defendants argued before that Plaintiffs were motivated to terminate Panagg's franchise to transfer it to Ninety Rock. But although motive is not relevant here, as shown in the *Robertson* case, Defendants offered no evidence to support this claim at trial, basically dropping the argument.

costs concerning their unsuccessful lost profits claim, then they need not brief the issue.

Regardless of whether Plaintiffs choose to pursue fees and costs for the lost profits claim on which they did not prevail, their application for fees and costs must, of course, be reasonable. The Court anticipates that any request for attorney's fees and costs from Plaintiffs will be fair and reasonable and err on the side of caution.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on October 25, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to:**</u>
All counsel of record